# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 11, 2019          Decided July 14, 2020

No. 17-5008

TIMOTHY JEFFRIES,
APPELLANT

v.

WILLIAM P. BARR, ATTORNEY GENERAL, U.S. DEPARTMENT
OF JUSTICE,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01007)

———

*Jerry R. Goldstein* argued the cause and filed the briefs for appellant.

*Jane M. Lyons*, Assistant U.S. Attorney, argued the cause for appellee.  With her on the brief were *Jessie K. Liu*, U.S. Attorney, and *R. Craig Lawrence* and *Marsha W. Yee*, Assistant U.S. Attorneys.

Before: PILLARD, WILKINS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

2

Opinion concurring in part and dissenting in part filed by *Circuit Judge* PILLARD.

WILKINS, *Circuit Judge*: Timothy Jeffries brought suit against the Department of Justice ("DOJ") under Title VII of the Civil Rights Act of 1964, alleging discrimination on the basis of his race and his sex, as well as retaliation for protected activity. Specifically, he cites seven instances of being passed over for positions for which he believes he was qualified. DOJ moved for summary judgment before any formal discovery had taken place, and the District Court granted that motion. At the same time, the District Court denied Jeffries's motion, brought under Federal Rule of Civil Procedure ("Rule") 56(d), requesting to be allowed to take discovery.

In one sense, the posture of this case seems out of order, as a motion for summary judgment typically follows the conduct of at least some formal discovery rather than preceding it entirely. But Rule 56(b) provides that, with certain exceptions inapplicable here, "a party may file a motion for summary judgment *at any time* until 30 days after the close of all discovery." FED. R. CIV. P. 56(b) (emphasis added). A nonmovant may well be surprised by an early-filed summary-judgment motion, but the timing of such a motion need not be a death knell: The Rules also iterate that relief – including discovery – may be obtained by a nonmovant who makes the required showing. *See id.* 56(d).

In the case at bar, the District Court determined that Jeffries failed to make that showing as to each one of the disputed nonselections. For the most part, we find that the District Court acted within its discretion in so finding – with the notable exception of the handling of Jeffries's quest for discovery on his first nonselection. In that respect, the District Court's denial of Jeffries's Rule 56(d) motion was premised on

3

error and was thus an abuse of discretion. We therefore vacate the District Court's entry of judgment as to that nonselection and reverse its denial of the relevant portion of Jeffries's Rule 56(d) motion. But perceiving neither genuine issues of material fact nor any abuse of discretion in the District Court's treatment, respectively, of DOJ's motion for summary judgment or Jeffries's Rule 56(d) motion with regard to the second through seventh nonselections, we affirm on those claims the District Court's entry of judgment in DOJ's favor and its denial of Jeffries's Rule 56(d) motion.

**I.**

We recite the facts based upon the parties' summary-judgment filings below, considering those facts in the light most favorable to Jeffries. *See Wilson v. Cox*, 753 F.3d 244, 245 (D.C. Cir. 2014).

The Office of Justice Programs ("OJP") is a component of DOJ, and the Bureau of Justice Assistance ("BJA") is a bureau of OJP. Timothy Jeffries is an African-American male who has been employed with OJP since 2000 and with BJA since 2002. Sometime between his hire and 2008, Jeffries filed three complaints against DOJ with the Equal Employment Opportunity Commission ("EEOC"). These complaints were consolidated and were the subject of a March 2008 settlement agreement, which resulted in Jeffries's reassignment to a GS-13 Policy Advisor position in the Substance and Mental Health Division ("SAMH") of BJA, the position he held while this case was pending below.

*Priority Consideration and First Nonselection (Supervisory Grants Program Manager)*

In 2006, Jeffries was not interviewed for a GS-14 Program Analyst position in SAMH due to an error with the processing

4

of his application.  On July 30, 2007, as a result of this lack of consideration, OJP issued Jeffries a "priority consideration" letter, which provided that Jeffries would "receive priority consideration for the next open position similar and in the same geographical area to the one [for] which proper consideration was missed," and that such consideration would "be granted to [Jeffries] prior [to DOJ] issuing public notice of the vacancy." J.A. 546.  The letter also said that Jeffries would be notified in writing when priority consideration had taken place. Regarding priority consideration, OJP's Merit Promotion Plan provides that candidates afforded priority consideration

> are considered by the selecting official, ahead of other candidates for a particular job vacancy. Priority consideration does not place conditions on the selecting official's right to select or not to select from any appropriate source at any point in the recruitment and staffing process.  A candidate who receives priority consideration is entitled to such consideration until referred for the next open similar position in the same geographical areas to one for which consideration was missed.

*Id.* 94-95.  At oral argument, DOJ conceded that, when priority consideration is normally being applied, the candidate gets the first interview and a decision "up or down" on her candidacy before other candidates are considered.  Oral Arg. Recording 13:48-13:59.

On March 29, 2011, Jeffries notified the human resources department at OJP of his desire to use the letter for a GS-14 Supervisory Grants Program Manager position, for which two vacancies had already been publicly announced.  Jeffries does not contend that the Supervisory Grants Program Manager

5

position was similar to the Program Analyst position (as would have triggered the automatic use of his priority consideration letter). After Jeffries invoked his priority consideration letter, but prior to his interview, OJP personnel compiled a list of "best qualified" applicants for the Supervisory Grants Program Manager position. J.A. 566-71.

Jeffries was interviewed on May 11, 2011. The interview panel consisted of Edmund Aponte (Hispanic male), Tammy Reid (African-American female), and Jonathan Faley (Caucasian male). All of the panelists were aware of Jeffries's having engaged in previous equal employment opportunity ("EEO") activity, and indeed Faley and Aponte had been named as responsible management officials in Jeffries's prior EEO complaints.

Aponte and Reid later indicated that they had compared Jeffries's qualifications to those of other applicants. DOJ conceded at oral argument that such comparisons are generally "not kosher" in the context of priority consideration and that they occurred in this instance. Oral Arg. Recording 15:47-16:04. There is a factual dispute as to whether the panelists told Jeffries at the conclusion of his interview that they had to interview other applicants before making a decision.

On July 29, 2011, OJP's human resources department informed Jeffries via letter that he had not been selected for the Supervisory Grants Program Manager position, and included four critiques of his interview performance, explaining that he had not demonstrated his fitness for the position. Tracey Trautman, the selecting official,[1] noted in a later affidavit that

---

[1] Jeffries attempts to create a dispute of fact as to the identity of the selecting official, but cites only his own declaration that he "was told via email by HR that the selecting official was James Burch[.]" J.A. 466; *see* Appellant's

6

Jeffries had provided the panel with a writing sample containing spelling and grammatical errors, and that the panelists' notes indicated that Jeffries had failed to give complete answers to several interview questions. The panelists' notes corroborate the incompleteness of some of Jeffries's answers. The panel interviewed other applicants in September 2011. The ultimate selectees were Naydine Fulton-Jones (African-American female) and Esmerelda Womack (Caucasian female). Neither selectee had previously filed a formal EEO complaint against DOJ.

### *Second Nonselection (Special Assistant)*

In September 2011, DOJ advertised a vacancy for a Special Assistant, a GS-13/14 position. The interview panel consisted of Patrick McCreary (Caucasian male), Ruby Qazilbash (Caucasian and Asian female), and Ellen Williams (African-American female). The panel interviewed eight applicants in total, scoring each of them on their interview (representing 35% of the total score), work history (20%), experience (35%), and "[r]esume – [e]ducation" (10%). J.A. 159. The Interview Guide for the Special Assistant position contained a five-point proficiency scale and allowed panel members to assign applicants a score for each of the fourteen interview questions. The interview panel discussed the applicants and "had the opportunity to reconcile the scores they attributed to candidates based upon this discussion and the opportunity for clarification." *Id.* 154. Williams's interview

---

Br. 30. The best evidence rule, together with this Circuit's precedent, preclude consideration of Jeffries's statement. *See* FED. R. EVID. 1002; *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) ("While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." (emphasis in original)).

7

scoresheet for Jeffries's interview (which is the only scoresheet from this selection in the record) shows that Williams changed her scores in three instances, each time downgrading Jeffries by one point on the scale.

Jeffries was interviewed on December 2, 2011. Neither Williams nor McCreary was aware at the time of Jeffries's interview of any of his prior EEO complaints. Qazilbash averred in May 2012 that she learned in 2008 that Jeffries was being transferred onto her team as a result of some sort of settlement, which she "assumed to be EEO-related," and that in March 2011 she was informed that Jeffries would be afforded priority consideration "as a result of an EEO-related settlement a few years earlier[.]" *Id.* 125-26. In August 2012, Qazilbash averred that she had learned of EEO complaints or pre-complaints filed by Jeffries on July 1, 2011, December 28, 2011, and April 17, 2012.

The selectee was Cornelia Sorensen Sigworth (Caucasian female). Shortly before the vacancy announcement was posted, Sigworth was given a special assignment to work with grant-funded programming and technical assistance to Puerto Rico. The interview panel scored her higher than Jeffries in three of the four categories, and she tied with him in the "[r]esume – [e]ducation" category. *Id.* 159. Overall, Jeffries was ranked sixth of the eight applicants, with a combined score of 76.09 out of 100, and Sigworth scored 95.7 and was ranked first. Sigworth had made no prior formal EEO complaints against DOJ.

Sigworth and Qazilbash were part of a self-described "mommies group" at BJA whose members spent time together outside of work. *Id.* 464. Another member of this group, Kim Ball Norris, expressed to a supervisee her belief that Jeffries held his then-current position only because of his race and EEO

8

activity, and professed an intention to get Jeffries and another African-American employee fired.

*Third Nonselection (Senior Policy Advisor for Evidence Integration)*

DOJ advertised an opening for a Senior Policy Advisor for Evidence Integration in October 2012. Six candidates were interviewed by a panel that consisted of Aponte, Elizabeth Griffith (Caucasian female), and either Rebecca Rose (Caucasian female) or Kristina Rose (Caucasian female). Kristina Rose participated in Jeffries's interview. It appears that Jeffries's interview took place in November or December 2012.

Aponte had learned of Jeffries's EEO activity in 2007, and evidently learned of it again in August 2012 when he completed an EEO-related affidavit. Griffith became aware of Jeffries's EEO activity at some unspecified point in time, having been deposed twice in connection with his prior EEO cases. Kristina Rose was not aware of Jeffries's prior EEO activity.

The panel interviewed six candidates and reached a "strong consensus" that Edward Banks (African-American male) and Kristina Kracke (female of unknown race) "were clearly the top candidates" and were recommended for a second interview.[2] Def.'s Statement of Material Facts ("SMF") Ex. 19, ECF No. 7-3 at 175, *Jeffries v. Lynch*, 217 F. Supp. 3d 214 (D.D.C. 2016), No. 15-cv-01007. Banks was ultimately

---

[2] Jeffries asserts without citation to the record that neither Banks nor Kracke had engaged in "prior EEO activity." Appellant's Br. 40. We take no view on Jeffries's unsupported contention that, when they interviewed for the Senior Policy Advisor for Evidence Integration position, Banks and Kracke had engaged in no "prior EEO activity."

9

selected. According to Aponte, Banks had a Ph.D, had published articles on evidence integration, and scored a 5 out of 5 in the application process, whereas Jeffries scored a 1.6. Kristina Rose stated that Banks "scored the highest on the interview[]" and that Jeffries "scored the lowest of all the candidates." J.A. 121.

*Fourth Nonselection (Administrative Services and Logistics Director)*

In October 2012, DOJ posted a vacancy for an Administrative Services and Logistics Director. The interview panel consisted of Shanetta Cutlar (African-American female), Hope Janke (Caucasian female), and Kristen Mahoney (Caucasian female). There were only two applicants: Michelle Martin (Caucasian female) and Jeffries. Martin was recommended for a second-round interview, while Jeffries was not. The candidates were assessed on their resume, "[w]ork [e]xperience (KSAs)",[3] interview performance, and work history. *See Lynch*, Def's SMF Ex. 25, ECF No. 7-3 at 221. Mahoney gave Jeffries an overall score of 77 and Martin a 90; Janke gave Jeffries a 71 and Martin an 84; and Cutlar gave Jeffries a 63 and Martin a 73. Cutlar (the only panelist whose affidavit is in the record) stated that Martin's "experience related more to the qualifications and the job advertisements," while Jeffries "readily identified that he did not have the experience in the area." J.A. 180.

---

[3] KSAs stands for "[k]nowledge, [s]kills, and [a]bilities." Appellant's Br. viii; Appellee's Br. 37.

10

*Fifth Nonselection (Supervisory Grants Management Specialist)*

In November 2012, DOJ posted a vacancy for a Supervisory Grants Management Specialist. The announcement stated that there was one vacancy, but in fact two applicants were selected. Prior to the posting of the vacancy, the position was downgraded from a GS-14 position to a GS-13/14 position. Cory Randolph, a biracial African-American and Caucasian male who was one of the selectees, was at the time ineligible for a GS-14 position. Jonathan Faley, an OJP supervisor, encouraged Randolph and a handful of other people to apply.

The first-round interview panel was made up of Kellie Dressler (Caucasian female), Aponte, and Faley. Four candidates, including Jeffries, were interviewed in the first round. The ultimate selectees – Randolph and Brenda Worthington (Caucasian female) – received second-round interviews, which were conducted by Trautman and Denise O'Donnell (Caucasian females). Prior to his second-round interview, Randolph received an email from the vice president of his union congratulating him "on the [j]ob." *Id.* 818, 820-22.

The members of the first-round interview panel stated that Jeffries failed to fully answer the interview questions and to demonstrate that he had relevant experience or abilities, and that the selectees performed better in both these regards. The record does not reveal the date(s) of the first-round interviews, but the second-round interviews took place on February 13, 2013. On March 1, 2013, Trautman and Faley had an email exchange in which they discussed having jokingly told others that Jeffries had been selected for this position.

11

*Sixth Nonselection (Senior Policy Advisor for Byrne Criminal Justice Innovation/Building Neighborhood Capacity Programs)*

In late 2012 and early 2013, thirteen applicants were interviewed in the first round by one of two three-person panels. The panel that interviewed Jeffries was made up of Banks, David Adams (Caucasian male), and Rebecca Rose. The parties agree that Jeffries's first-round panel interviewed the ultimate selectee as well. After the first round of interviews, applicants were assigned scores based on their interview, resume, experience, and work history; Jeffries was ranked fourth with a total score of 62.80, and the ultimate selectee, Alissa Huntoon (Caucasian female), was ranked first with a score of 93.73. Although initially only Huntoon and the second-highest-scoring candidate were recommended for second-round interviews, six candidates, including Jeffries, received second-round interviews with Griffith, Mahoney, and O'Donnell. Huntoon was given the position. As the February 2013 memorandum recommending Huntoon stated, "[t]he management team concluded that [Huntoon] stood out in particular in two areas that are core to the skills needed . . . : Subject matter expertise . . . [and] Strong Policy Orientation and Project Leadership." *See Lynch*, Def.'s SMF Ex. 40, ECF No. 7-4 at 33 (discussing Huntoon's qualifications at some length).

In December 2012, prior to her selection, Huntoon was one of a number of BJA employees invited to a meeting with personnel from the National Institute of Justice ("NIJ"). The stated purpose of the meeting was to share information and find potential areas of collaboration. Huntoon and the other invitees were asked to speak about their work.

12

*Seventh Nonselection (Senior Policy Advisor for Health and Criminal Justice)*

In April 2014, DOJ posted a vacancy for a Senior Policy Advisor for Health and Criminal Justice. According to his resume, Jeffries had served in this position in an acting capacity from June to August 2010. The first-round interview panel for the 2014 selection was made up of Sigworth, Anna Johnson (female of unknown race), and Michael Dever (Caucasian male). Based on numerical scores given for resume, experience, interview, and work history, Jeffries was ranked fifth of eight interviewees after the first round with a 4.5. Danica Binkley (Caucasian female), the ultimate selectee, was ranked third with a 4.7. The five top candidates received a second interview. The second-round interviews were conducted by a panel consisting of O'Donnell, Mahoney, and Qazilbash. In a June 30, 2014, memorandum recommending Binkley's hire, Qazilbash stated that Binkley "became the top candidate" during the second round of interviews. J.A. 229. Qazilbash further stated that Binkley

> demonstrated strong communication skills, provided complete responses to all questions, was motivated and detail oriented, and had an advanced understanding of the technical qualifications of the position. . . . Ms. Binkley has experience with each major aspect of the portfolio . . . . She has performed to a very high level in her work as a policy advisor within the Substance Abuse and Mental Health portfolio including meeting significant challenges in managing difficult projects [and] developing communication materials at an advanced policy level[,] and has proven her skills to develop new ideas and programming.

13

*Id.* 229-30; *see also id.* 210 (affidavit of O'Donnell discussing Binkley's qualifications), 219 (affidavit of Mahoney discussing the same), 226 (affidavit of Qazilbash stating that Binkley's qualifications "were demonstrated through her resume and interview responses").    The panelists cited Jeffries's difficulty "articulating a vision," *id.* 210; *accord id.* 219, 226, and noted that his responses to questions lacked depth, *see id.* 210 ("His responses during the interview process focused more on process than substance."), 219 ("He left the impression during the interview that this focus or policy perspective is one dimensional[.]"), 227 ("[Jeffries] indicated that he does not have an understanding of priority work in the mental health side of the portfolio, and has limited understanding of the healthcare coverage priority area.").

## II.

Jeffries timely filed EEOC complaints regarding each of the seven nonselections.[4]    Written discovery was undertaken only with regard to Jeffries's complaint over the second nonselection, but some documents related to the other nonselections were produced in said discovery.    Jeffries then filed the instant action against the then-Attorney General.[5]

Prior to the conduct of any formal discovery in this case, DOJ moved for judgment on the pleadings, or for summary

---

[4] Jeffries also made complaints to EEOC regarding "several instances where he did not receive cash and time-off awards like his coworkers."  J.A. 900. These issues were included in his complaint to the District Court and were also encompassed within the District Court's grant of summary judgment to DOJ.  Jeffries does not, however, raise those claims before this Court.

[5] DOJ concedes in its brief to this Court that Jeffries filed suit "[a]fter enough time had passed without resolution by the Commission[.]" Appellee's Br. 7.

14

judgment in the alternative, relying on extensive documentation apparently produced in the course of EEOC proceedings.  Along with his opposition to DOJ's motion, Jeffries filed a motion for relief under Rule 56(d) and an accompanying declaration of counsel, requesting an order allowing Jeffries to take discovery.  Jeffries sought broad discovery on each nonselection, asserting that "the facts developed" thereby would "demonstrate that [DOJ's] rationales for not selecting Jeffries for any of the positions in issue . . . are pretext and that the true reasons are discrimination and/or retaliation."  J.A. 898.

Having before it DOJ's sixty-two exhibits and Jeffries's sixty-six, and finding no genuine dispute of material fact, the District Court granted DOJ's motion for summary judgment. *Lynch*, 217 F. Supp. 3d 214.  The District Court also denied Jeffries's Rule 56(d) motion in a series of footnotes to its Memorandum Opinion, holding that Jeffries's filings did not meet the first requirement set forth in *Convertino v. U.S. Department of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012): that is, they did not "outline the particular facts [Jeffries] intend[ed] to discover and describe why those facts are necessary to the litigation," *Lynch*, 217 F. Supp. 3d at 227; *see id.* 232 n.13, 235 n.16, 236 n.17, 238 n.19, 241 n.21, 243 n.23, 246 n.24.[6]

_____

[6] After filing a notice of appeal of the District Court's order, Jeffries moved this Court to remand the case, citing the need to explore allegations contained in a May 2017 email from Jeffries's union president that one of the interview panelists for several of the nonselections at issue had committed various acts of sexual impropriety with women in BJA.  Jeffries also filed in the District Court a motion for relief from judgment, pursuant to Federal Rule of Civil Procedure 60(b)(2), on the same basis.  The District Court denied the motion without prejudice via a minute order, citing Jeffries's motion to remand.  This Court then held the parties' motions for summary affirmance and summary reversal in abeyance and directed the

15

**III.**

We consider first the District Court's denial of Jeffries's Rule 56(d) motion.

Rule 56(d) provides an avenue for relief for nonmovants who can show, by affidavit or declaration, that "for specified reasons" they "cannot present facts essential to justify" their opposition to summary judgment. FED. R. CIV. P. 56(d). A successful Rule 56(d) motion can result in a district court's deferring consideration of a pending summary judgment motion, denying the motion, allowing time to take discovery, or issuing "any other appropriate order." *Id.* To obtain relief, a Rule 56(d) movant must: (1) "outline the particular facts [the party defending against summary judgment] intends to discover and describe why those facts are necessary to the litigation"; (2) explain why the party could not produce those facts in opposition to the pending summary-judgment motion;

---

District Court to address the merits of Jeffries's 60(b) motion. Following the District Court's denial of Jeffries's motion for relief from judgment, this Court denied the motions for summary reversal, summary affirmance, and remand, noting that Jeffries had not filed an amended notice of appeal to include the District Court's denial of his Rule 60(b) motion, meaning that denial "is not properly before this [C]ourt." No. 17-5008, May 9, 2018 Order, at 1. The Court further noted that Jeffries had not shown "why this [C]ourt should depart from its ordinary practice and consider his new evidence on appeal." *Id.*

Jeffries cites repeatedly to the May 2017 email in his briefing, arguing that it creates a factual dispute as to whether the panelist in question favored female applicants for several of the at-issue positions in an attempt to curry favor with them to nefarious ends. In light of the Court's earlier ruling on this issue, we do not consider those of Jeffries's arguments that are premised on the May 2017 email.

16

and (3) "show [that] the information is in fact discoverable." *Convertino*, 684 F.3d at 99-100.

We review the denial of a Rule 56(d) motion for abuse of discretion. *Cruz v. McAleenan*, 931 F.3d 1186, 1191 (D.C. Cir. 2019). A district court's error of law is "by definition" an abuse of discretion, so our review comprehends ensuring "that the discretion was not guided by erroneous legal conclusions." *Koch v. Cox*, 489 F.3d 384, 388 (D.C. Cir. 2007) (citation omitted). But "[o]ur review for abuse of discretion does not permit us to substitute our judgment for that of the trial court." *United States v. Mathis-Gardner*, 783 F.3d 1286, 1288 (D.C. Cir. 2015) (citation and internal quotation marks omitted). "Trial courts have a broad discretion in discovery matters and appellate courts will reverse only for abuse for action which is arbitrary, fanciful, or clearly unreasonable." *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981) (internal quotation marks omitted).

Though "[s]ummary judgment usually 'is premature unless all parties have had a full opportunity to conduct discovery,'" *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 530 (D.C. Cir. 2019) (quoting *Convertino*, 684 F.3d at 99), a Rule 56(d) motion "must be resolved through 'application of the *Convertino* criteria to the specific facts and circumstances presented in the request,' rather than on the basis of presumptions about a given stage of litigation," *id.* (quoting *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 27 (D.C. Cir. 2014)). This Court has regularly looked beyond a litigant's declaration to his briefing in analyzing whether the *Convertino* elements have been satisfied. *See, e.g.*, *Haynes*, 924 F.3d at 531; *Smith v. United States*, 843 F.3d 509, 513 (D.C. Cir. 2016); *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1045-46 (D.C. Cir. 2008).

17

The District Court's reasoning in denying Jeffries's Rule 56(d) motion was based on the first *Convertino* element. The District Court explained that Jeffries had failed to outline what facts he hoped to discover and why those facts were necessary to support his claims. *See Lynch*, 217 F. Supp. 3d at 232 n.13, 235 n.16, 236 n.17, 238 n.19, 241 n.21, 243 n.23, 246 n.24.

Jeffries makes a general statement that the District Court abused its discretion by ruling that his discovery requests were either irrelevant or vague, but he never develops the argument. Instead, he lists in general terms the discovery he seeks and essentially reargues his Rule 56(d) motion. But we do not find an abuse of discretion based on whether we, if standing in the District Court's shoes, would have granted the motion. *See Mathis-Gardner*, 783 F.3d at 1288. Rather, Jeffries must contend with the applicable standard of review, which here means showing either a legal error in the District Court's reasoning or a basis for this Court to conclude that the District Court's action was "arbitrary, fanciful, or clearly unreasonable." *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d at 679.

With respect to the second through seventh nonselections, the District Court acted within its discretion in ruling as it did. It is true that this Court has displayed a willingness to apply the criteria iterated in *Convertino* less than stringently; in *Ikossi*, for example, we excused the relative "lack of precision" of an affidavit that sought the depositions of a Title VII plaintiff's supervisors, finding that the stated desire to discover "their motivations in taking disciplinary action against" the plaintiff made "the nature of the evidence [sought]" "self-evident." 516 F.3d at 1045. Here, though, Jeffries's brief and his counsel's declaration are quite far removed from Jeffries's claims. Rather than being directed at "particular facts," Jeffries's filings in the District Court express a desire to discover general

18

facts about what happened.  *See, e.g.*, J.A. 902 ("[T]here are many ambiguous and unknown facts with respect to each of the non-selections . . . in issue which are essential to Jeffries'[s] opposition to the Defendant's Motion, as well as to proving his case at trial."), 890 ("[T]he panelists for this position need to be deposed to explain their notes and scoring and exactly what occurred during the interview process.").

And even were we to construe the broad categories of information sought as constituting "particular facts" under *Convertino*, Jeffries simply does not "describe why those facts are necessary to the litigation."  *Convertino*, 684 F.3d at 99. Said differently, Jeffries does not state in his Rule 56(d) filings how the information he seeks would assist him in creating a genuine issue of material fact.  Indeed, far from connecting the requested discovery to the substance of his claims, Jeffries barely even mentions his claims in his Rule 56(d) filings, and those few included references are in very broad terms.  *See, e.g.*, J.A. 898 ("It is anticipated that the facts developed through the depositions and other discovery sought . . . will demonstrate that the Defendant's rationales for not selecting Jeffries for any of the positions in issue . . . are pretext and that the true reasons are discrimination and/or retaliation."), 902 ("[F]urther discovery is needed as to all of the selections . . . in issue to demonstrate that the rationales asserted by the Defendant for not selecting Jeffries are pretext and the true reasons are discrimination and/or retaliation.").  We cannot say the District Court abused its discretion in concluding, as to the second through seventh nonselections, that *Convertino* requires more.[7]

_____

[7] Our dissenting colleague, analogizing Jeffries's Rule 56(d) filings to commensurate filings in *Chappell-Johnson v. Powell*, 440 F.3d 484 (D.C. Cir. 2006), and *Ikossi*, 516 F.3d 1037, asserts that we should find the District Court to have abused its discretion in denying Jeffries's Rule 56(d) motion,

19

---

*see* Dissenting Op. at 7-8.  But in *Chappell-Johnson*, we had no occasion to address whether the plaintiff's filings were sufficiently detailed, because the issue there presented was the district court's error in confining the plaintiff to a particular legal theory.  440 F.3d at 487 (noting that the district court had denied plaintiff's motion for discovery on finding that, as pled, the plaintiff's claim "necessarily failed"); *id.* at 488-89 (explaining the legal error and reversing the district court's denial of the motion for discovery on that basis).

And while in *Ikossi* we did engage in a relevant discussion of the sufficiency of the plaintiff's filings, 516 F.3d at 1045-46, those filings, as already noted, stand in contrast to Jeffries's.  The affidavit submitted in support of Ikossi's request for discovery set forth in some detail both the information sought in the requested discovery and how that information was pertinent to Ikossi's prosecution of her case.  *See, e.g.*, Aff. of Michael D. Kohn Submitted Pursuant to Rule 56[(d)] Fed R. Civ. P., ECF No. 10-2 at ¶ 3, *Ikossi v. England*, 406 F. Supp. 2d 23 (D.D.C. 2005), No. 04-cv-1392 ("Each of the [prospective deponents] possesses substantial relevant information pertaining to Defendants' motives for taking the challenged disciplinary actions against Plaintiff."); *id.* at ¶ 4 ("Plaintiff's first-level supervisor . . . is in possession of information regarding Plaintiff's claims that her work performance was acceptable."); *id.* at ¶ 5 (prospective-deponent supervisor "initiated Defendants' official personnel actions against Plaintiff" and "therefore has direct knowledge of Defendants' motives for terminating Plaintiff"); *id.* at ¶ 7 ("Plaintiff should be afforded the opportunity to depose [her supervisor] to determine whether he was motivated to take action against Plaintiff for discriminatory or retaliatory reasons.").  While noting that the affidavit "d[id] not identify precisely what evidence it is hoped will be discovered," we observed that "[t]his lack of precision does not make any less self-evident . . . the nature of the evidence Dr. Ikossi seeks[.]"  513 F.3d at 1045.

The circumstances in *Ikossi* are to be contrasted with those here present.  Jeffries's Rule 56(d) filings lack even the precision of those in *Ikossi*, and instead are cast in very general terms.  *See, e.g.*, J.A. 891-93 (listing purported irregularities with a nonselection and simply concluding that, "[b]ased on these irregularities, [several named people] need to be deposed"); *id.* 902 ("[T]here are many ambiguous and unknown facts with respect to each of the non-selections . . . in issue which are essential to Jeffries' opposition to the Defendant's Motion[.]").  The infirmities of

20

The District Court's ruling on that portion of Jeffries's Rule 56(d) motion that addressed his first nonselection, however, is a different story.  Here we find that the District Court abused its discretion in denying the motion, as the denial was premised in part on an erroneous view that the discovery sought about the priority consideration was "irrelevant."  *Lynch*, 217 F. Supp. 3d at 232 n.13; *see id.* at 230 n.10 (holding that any claim premised on the priority consideration itself "fails at the threshold").[8]  In so holding, the District Court failed to appreciate the relevance of the priority consideration to Jeffries's claim over the first nonselection.

DOJ conceded at oral argument that (1) when a candidate gets priority consideration under normal circumstances, it is improper for the interview panelists to compare that candidate's qualifications with others', Oral Arg. Recording

---

Jeffries's motion and affidavit take his filings outside the ambit of *Ikossi*, such that we cannot say that the District Court abused its discretion in finding that Jeffries failed to "outline the particular facts he intends to discover and describe why those facts are necessary to the litigation." *Convertino*, 684 F.3d at 99.

*Convertino* is the law of the Circuit.  Were we to conclude that the District Court abused its discretion in not finding Jeffries's Rule 56(d) filings to have satisfied *Convertino*'s first prong, we would be diluting the dictates of *Convertino* to such a degree as to functionally overrule them.  This is something that we, sitting as a three-judge panel, cannot do.  *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc) ("One three-judge panel . . . does not have the authority to overrule another three-judge panel of the court.").

[8] Because we find that the District Court erred in denying Jeffries's Rule 56(d) motion with regard to priority consideration due to its relevance to Jeffries's claims over the first nonselection, we need not and do not reach the separate questions of whether a failure to afford priority consideration constitutes an adverse employment action or whether Jeffries would be entitled to discovery on the priority-consideration claim standing alone.

21

15:47-16:04, and (2) there is some indication that the panelists who interviewed Jeffries for the Supervisory Grants Program Manager position made comparisons between Jeffries and other applicants, *id.* 16:40-17:12. (This latter point is supported by the record. *See* J.A. 78, 637.) DOJ contends that any deviations from its standard priority consideration procedure were the result of Jeffries's belated invocation of his priority consideration letter. But nothing about the fact that Jeffries did not request to use the letter until after the vacancies had posted compelled the panelists to make comparisons between Jeffries and the other candidates. In other words, there was an unexplained deviation from DOJ's standard practices – and such a deviation "can justify an inference of discriminatory motive." *Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003). Of course, "[a]n employer's failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual," *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Johnson v. Lehman,* 679 F.2d 918, 922 (D.C. Cir. 1982)) – but such a failure is certainly not irrelevant.

Moreover, some of the discovery Jeffries sought with respect to the priority consideration has the potential to call into question the credibility of the panelists and the selecting official, on whose stated observations and judgments DOJ relied for its legitimate, nondiscriminatory reason for Jeffries's nonselection. Jeffries proffered evidence indicating that Naydine Fulton-Jones, one of the ultimate selectees, was interviewed either before he was interviewed or before he received notice that he was not selected – in any case, prior to September 2011, which is when all three panelists and Tracey Trautman averred that the competitive interviewing took place. Although this evidence is inadmissible hearsay and cannot itself create a genuine issue of fact, Jeffries sought in his Rule 56(d) motion to depose Fulton-Jones on this issue. Such

22

deposition testimony from Fulton-Jones, which likely *would* be admissible, could call into question the veracity of DOJ's proffered reason for Jeffries's nonselection for this position. Such testimony could also clarify whether DOJ failed to follow its standard priority consideration practices in this regard. Again, discovery on this issue is not irrelevant.

And in light of other record evidence relating to this nonselection, we do not believe the District Court's error here to have been harmless. *See* 28 U.S.C. § 2111. For instance, the record reveals that DOJ generated a "best qualified" list of applicants for this position after Jeffries's invocation of the priority consideration letter but prior to his interview and rejection, J.A. 569, which appears to be an additional departure from DOJ's standard practices for priority consideration. There is also a dispute of fact as to whether the panelists told Jeffries at the conclusion of his interview that they had to interview other candidates before making a decision. *See id.* 71 (Faley affidavit), 466 (Jeffries's declaration), 640 (Reid affidavit). And there is an unresolved question – not addressed below – as to whether Jeffries may be entitled to an adverse inference on the basis of DOJ's apparent destruction of documents pertaining to this nonselection.[9] In view of the existing record and DOJ's concessions regarding the panelists' comparisons between Jeffries and other applicants, the

---

[9] In opposing DOJ's summary-judgment motion, Jeffries pointed out that DOJ claimed, in its answers to interrogatories proffered in EEOC proceedings, to have destroyed some of the records with respect to the first nonselection "'on or about November 6, 2013' pursuant to its policy of only maintaining them for two years from the selection date." *Lynch*, Pl.'s Opp. to Summ. J., ECF No. 9 at 28; *see* J.A. 491. Jeffries argued for his entitlement to an adverse inference as a result of the destruction of these documents, *id.* at 29, but the District Court's Memorandum Opinion contains no mention of this argument in the context of the first nonselection, *see generally Lynch*, 217 F. Supp. 3d at 229-32.

23

requested discovery into the priority consideration could raise questions about DOJ's proffered reason for Jeffries's nonselection.

For these reasons, we find it appropriate to reverse the denial of Jeffries's Rule 56(d) motion as to the first nonselection and vacate the District Court's entry of judgment in DOJ's favor on those of Jeffries's claims arising out of that nonselection.

## IV.

The above represents the only respect in which we find the District Court to have erred, as we cannot say that the fate suffered by Jeffries's claims over the second through seventh nonselections was undeserved. In each instance, Jeffries failed to create a genuine issue of fact as to whether DOJ's qualifications-based explanations were pretextual for discrimination or retaliation, and the District Court's grant of summary judgment as to the claims over those nonselections was in each instance proper. We address those nonselections now, in turn.

## A.

### 1.

This Court's review of the District Court's grant of summary judgment is *de novo*. *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). Summary judgment is appropriate where the movant can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it is one "that might affect the outcome of the suit under the governing law[.]" *Anderson*

24

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A properly supported motion for summary judgment may not be opposed by "mere allegation or denial[]"; rather, the nonmovant must come forward with "specific facts showing that there is a genuine issue for trial." *Id.* at 256. The nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see also Aka*, 156 F.3d at 1295 (noting that the Court must view the evidence "as favorably to [the non-movant] as reason will permit").

**2.**

Title VII of the Civil Rights Act protects federal employees against disparate treatment in "personnel actions affecting employees" on the basis of, *inter alia*, race and sex. 42 U.S.C. § 2000e-16(a). The aim of disparate-treatment claims is to ferret out and eliminate intentional discrimination. *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C. Cir. 1984). "'Proof of illicit motive is essential,' and the employee 'at all times' has the burden of proving 'that the defendant intentionally discriminated against' her." *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (quoting *Segar*, 738 F.2d at 1267). Where (as here) there is no direct evidence of discrimination, a plaintiff bringing a disparate-treatment claim may avail herself of the three-step, burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). Under the *McDonnell Douglas* framework, a plaintiff must make out a *prima facie* case of discrimination; once she has done so, the defending employer must "articulate some legitimate, nondiscriminatory reason"

25

for its action.  *Burdine*, 450 U.S. at 252-53 (quoting *McDonnell Douglas*, 411 U.S. at 802).  Should the employer carry its burden at the second step, the plaintiff must prove that the employer's asserted reasons "were not its true reasons, but were a pretext for discrimination." *Id.* at 253.

Federal agency employers are also prohibited by Title VII from retaliating against employees for asserting their Title VII rights.  *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011).  The *McDonnell Douglas* burden-shifting framework may be applied to claims of retaliation.  *See McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012).

Recognizing that courts frequently waste time on the early stages of the *McDonnell Douglas* analysis, this Court held in *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008), that, "[i]n a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," a district court faced with an employer's motion for summary judgment "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* at 494; *see also Cruz*, 931 F.3d at 1194 (applying this analysis in the context of Title VII retaliation).  In other words, district courts in this Circuit are directed, where appropriate, to avoid the "unnecessary sideshow" of the first two prongs, *Brady*, 520 F.3d at 494, and proceed to consider the question of pretext.

In order for a Title VII plaintiff to "survive summary judgment based solely on evidence of pretext," – i.e., in the absence of direct evidence – "the evidence must be 'such that

26

a reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason.'" *Mayorga v. Merdon*, 928 F.3d 84, 90 (D.C. Cir. 2019) (quoting *Walker v. Johnson*, 798 F.3d 1085, 1096 (D.C. Cir. 2015)). "In an appropriate case, the factfinder's disbelief of the reasons put forward by the defendant will allow it to infer discrimination." *Aka*, 156 F.3d at 1294 (citation, internal quotation marks, and alteration omitted).

"A plaintiff may support an inference that her employer's stated reasons for undertaking the adverse employment action in question were pretextual by citing a number of possible sources of evidence, including 'the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, [ ] the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.'" *Wheeler*, 812 F.3d at 1115 (quoting *Walker,* 798 F.3d at 1092) (alteration in original).

**B.**

Before proceeding to our review of the summary-judgment motion, we must pause and observe that this case's (minor) curiosity flows not only from its procedural posture, but also from the plaintiff's untraditional style of briefing. Jeffries frequently fails to develop arguments for his claims, often choosing instead to simply state facts (inviting the Court, perhaps, to make of them what it will) and to point without elaboration to errors the District Court allegedly made on summary judgment (a peculiar approach, given our *de novo* review). This Court is not in the habit of doing parties'

27

lawyering for them, and we decline to take up that task now. *See Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) ("[J]udges are not like pigs, hunting for truffles buried in briefs or in the record[.]"); *Consol. Edison Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Our discussion of Jeffries's claims, therefore, is the result of the separation of the wheat of arguments made from the chaff of those potential arguments that might have been constructed from the raw materials Jeffries includes or alludes to in his briefing. We address only the former.

### Second Nonselection (Special Assistant)

Jeffries's iterated qualms with his nonselection for Special Assistant are twofold: the potential that Qazilbash (the only one of the three panelists who knew of Jeffries's prior EEO activity) influenced the others during score reconciliation, and the possibility that Sigworth was preselected for the position. But Jeffries puts forth no evidence of the alleged influence or of how Sigworth's "special assignment shortly before the selection . . . enabled her to enhance her qualifications." Appellant's Br. 39. "[S]peculations and allegations" are no substitute for record evidence and cannot by themselves "create a genuine issue of fact" as to pretext. *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010)).

Moreover, as to the score reconciliation (which we consider only in the context of retaliation, as Jeffries does not argue it was discriminatory), Jeffries fails to point to any positive evidence connecting it with his protected activity. Qazilbash acquired knowledge of Jeffries's EEO activity three years before the interview, then again nine months prior, and

28

possibly again five months prior. This temporal proximity is the only causation evidence to which Jeffries points, and it is, "at best, weak." *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019). And even assuming that Jeffries's evidence of temporal proximity is sufficient to make out a *prima facie* case of retaliation, he has failed to come forward with "positive evidence beyond mere proximity," which "is required to defeat the presumption" that DOJ's proffered explanation for his nonselection is genuine. *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).

*Third Nonselection (Senior Policy Advisor)*

Jeffries contends that he was more qualified for the Senior Policy Advisor position than was the ultimate selectee, that Jeffries had experience that "should have been highly relevant to the duties of the position," and that Aponte retaliated against him by giving him low scores on the interview questions. Appellant's Br. 40-42.

A plaintiff attacking a qualifications-based explanation may establish pretext by either (1) presenting evidence showing "a reasonable employer would have found the plaintiff *significantly* better qualified for the job but nevertheless failed to offer the position to her," *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (emphasis in original), or (2) "expos[ing] other flaws in the employer's explanation," *Aka*, 156 F.3d at 1295; *see also id.* ("For example, the plaintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision. Or a plaintiff can attempt to show that the employer's explanation misstates the candidate['s] qualifications."). But a Title VII plaintiff "is not limited to challenging the employer's explanation; she can also avoid summary judgment by presenting other evidence . . . that

29

permits an inference of discrimination." *Holcomb*, 433 F.3d at 899 (citing *Aka*, 156 F.3d at 1295 n.11).

Jeffries's arguments on this score simply never get off the ground. He states that he was the "only applicant to collaborate with the [NIJ] on a joint solicitation to package evidence into useful tools," Appellant's Br. 42, and cites to his affidavit further fleshing out his qualifications – but he fails to establish or even argue for the "*significant*[]" superiority of his own qualifications to the selectee's, *see Holcomb*, 433 F.3d at 899, as by discussing the selectee's qualifications at all. And although Jeffries baldly states that he had relevant experience, he fails to establish that DOJ misstated his qualifications. *See Aka*, 156 F.3d at 1295. To the extent Jeffries is arguing that DOJ mis*judged* his qualifications – that it "should have" considered him to be more qualified than it did – "[w]e have said that courts must not second-guess an employer's initial choice of appropriate qualifications," *Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir. 2007), but "rather . . . [should] 'defer to the [employer's] decision of what nondiscriminatory qualities it will seek' in filling a position," *id.* at 708-09 (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003)) (last alteration in original).

Jeffries's attempt to present other evidence that permits an inference of unlawful motive also fails. Jeffries's contention that this nonselection was due to Aponte's retaliatory animus is unsupported by any record evidence other than the weak temporal relationship between Aponte's knowledge of Jeffries's protected activity, acquired in August 2012, and Jeffries's November or December 2012 interview. Again, temporal proximity alone is insufficient to establish pretext. *See Woodruff*, 482 F.3d at 530.

30

*Fourth Nonselection (Administrative Services and Logistics Director)*

With regard to his fourth nonselection, Jeffries argues that the panelists' scoring of the applicants was subjective because the interview notes do not indicate how "scoring for the resumes, work experience, and work history was actually determined." Appellant's Br. 43. Jeffries also contends that Martin, the selectee, may have been preselected.

While recognizing that "employers may of course take subjective considerations into account in their employment decisions," this Court has repeatedly expressed concern over employers' *heavy* reliance on such factors, "[p]articularly in cases where a jury could reasonably find that the plaintiff was otherwise significantly better qualified than the successful applicant[.]" *Aka*, 156 F.3d at 1298; *see also Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012) (warning of "the ease with which heavy reliance on subjective criteria may be used to mask or camouflage discrimination" (citation and internal quotation marks omitted)). Some of the "subjective" assessments we have historically treated with caution are criteria like "interpersonal skills," *Fischbach,* 86 F.3d at 1184, "enthusiasm," *Aka*, 156 F.3d at 1298, and "presentation of self," *Hamilton*, 666 F.3d at 1356-57. Even where an employer does rely on "disputed subjective assessments," that reliance "will not create a jury issue in every employment discrimination case," as where it "is modest[] and the employer has other, well-founded reasons for the employment decision[.]" *Aka*, 156 F.3d at 1298.

The circumstances surrounding Jeffries's fourth complained-of nonselection are a far cry from those that have in the past raised the Court's hackles; in fact, Jeffries has failed to point to any troubling subjectivity at all. The panelists'

31

interview sheets indicate that applicants' resumes were
assessed for "written presentation, relevant experience
highlighted, etc.," and that their work history was assessed for
"stability, leadership, etc." *Lynch*, Def's MSJ Ex. 25, ECF No.
7-3 at 221. And although the sheets contain no explicit detail
as to the scoring for "[w]ork [e]xperience (KSAs)," all three
panelists assigned each applicant the same score for work
experience (24 for Jeffries, and 27 for Martin), and each
corrected her scoresheet to reflect that there were only 32
points available for work experience rather than 35 – both of
which indicate that the scores for work experience/KSAs were
grounded in *ob*jective considerations. An employer cannot be
held liable for "simply ma[king] a judgment call" on
permissible grounds. *See Holcomb*, 433 F.3d at 897.

Jeffries's preselection argument also fails. In support of
his assertion that there is a "possibility that [the position] was
tailored for Martin," Jeffries points to "substantial changes
[made] to the KSAs for the position before the vacancy
announcement," Appellant's Br. 43 – but he fails to explain
how those changes advantaged Martin and thus amounted to
preselection. Again, we decline to join Jeffries in
unsubstantiated speculation, and he cannot create a triable issue
of fact on conjecture alone.

### Fifth Nonselection (Supervisory Grants Management Specialist)

Jeffries's contentions with regard to the fifth nonselection
are threefold. Jeffries gestures at arguments that Randolph
(biracial male who was one of the ultimate selectees) was
preselected for the position, and that the email correspondence
between Trautman and Faley revealed discriminatory attitudes.
He also asserts an entitlement to an adverse inference on the
basis of spoliation of evidence.

32

Jeffries does point to evidence that, viewed in the light most favorable to him, could indicate that DOJ preselected Randolph: Faley's having encouraged Randolph to apply; the position's downgrade to a GS-13/14, which meant Randolph was eligible for it; the email to Randolph from the vice president of his union congratulating him on the promotion, sent before the second interview; and the fact that two applicants were selected rather than the one the vacancy announcement called for.  But Jeffries fails to produce any evidence from which a reasonable jury could conclude that the purported preselection was animated by discrimination or retaliation.  *See Mayorga*, 928 F.3d at 90; *see also Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005) ("[W]hile preselection may establish that an employee was unfairly treated, it does not by itself prove racial discrimination." (citation and internal quotation marks omitted)); *Blue v. Widnall*, 162 F.3d 541, 547 (9th Cir. 1998) ("[O]nly preselection based on discriminatory motives violates Title VII." (citing *Goostree v. Tennessee*, 796 F.2d 854, 861-62 (6th Cir. 1986)).  Moreover, DOJ's selection of Randolph – a biracial African-American/Caucasian male, arguably in the "same protected class" as Jeffries – "cuts strongly against any inference of discrimination" on the basis of Jeffries's race or sex.  *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005).

As to the email correspondence between Faley and Trautman in which they joked about having told others that Jeffries had been selected, while it was perhaps inappropriate, no reasonable jury could, on the basis of the email exchange, disbelieve DOJ's proffered qualifications-based explanation or conclude that explanation was pretextual.

Finally, Jeffries asserts – with no support from the record – that some interview notes related to this nonselection "are missing from the ROI," Appellant's Br. 46, which the Court

33

presumes to be reference to a report of investigation completed in connection with one of his EEO complaints. Citing *Gerlich v. U.S. Department of Justice*, 711 F.3d 161 (D.C. Cir. 2013), Jeffries asserts that "[t]he missing interview notes to support the ratings can lead to an adverse inference, or at least preclude summary judgment." Appellant's Br. 46. But we have no basis to consider this argument absent any citation to the record to support it. *Anderson*, 477 U.S. at 256; *see Jones*, 835 F.3d at 83.

Because Jeffries failed to create a triable issue of fact as to whether DOJ's explanation for the fifth nonselection was pretextual, the District Court's entry of judgment in DOJ's favor was proper.

*Sixth Nonselection (Senior Policy Advisor for Byrne Criminal Justice Innovation/Building Neighborhood Capacity Programs)*

With regard to the sixth nonselection, Jeffries argues that there are "questions about possible discriminatory/retaliatory pre-selection," and that one of the panelists arrived late to his interview "and rushed through it, cutting off his answers . . . as if she had already determined who she was going to select, or did not want to select him." Appellant's Br. 50-51. Neither of these arguments assists Jeffries in establishing that DOJ's proffered reasons for this nonselection were pretextual for discrimination or retaliation.

Given the weakness of the evidence on which he relies, Jeffries's cautious framing of the preselection issue – as a question about a possibility – is apt. Jeffries points to the fact that changes were made to the position's KSAs prior to its posting, to evidence that "persons outside of BJA with whom the selectee for the position would interact may have" participated in the selectee's interview, and to the selectee's

34

having been invited to participate in meetings prior to her interview. *Id.* 50-51. But the pre-posting changes made to the position do not evince preselection, as Jeffries again fails to connect those changes to the selectee's qualifications. And the only record evidence to which Jeffries points for his contention that outside personnel may have attended Huntoon's interview is an email exchange between O'Donnell and Griffith, in which O'Donnell stated a desire not to include outside personnel in the interviews and Griffith proposed meeting with those personnel instead. This indicates that it is *un*likely that non-BJA personnel participated in any of the interviews. While this Court is bound to view the facts in the light most favorable to Jeffries and to draw all legitimate inferences therefrom in his favor, *see Anderson*, 477 U.S. at 248, we will not step past inference into imagination. To be fair, Jeffries did not overplay his hand here, framing this allegation as something that "may have" happened – but again, the creation of a genuine issue of fact requires more than "speculations and allegations." *Porter*, 606 F.3d at 816.

As to the selectee's participation in meetings, Jeffries *does* overplay his hand, stating that Huntoon "was invited to attend meetings about the anticipated work of the position," Appellant's Br. 51, when in fact the record reveals that Huntoon was invited to a single meeting to discuss work she had already done. Jeffries also states in his declaration that "such meetings . . . are normally attended only by persons at the GS-14 level and higher," J.A. 468, but as Jeffries has failed to draw any connection between the meeting and the at-issue position, any deviation from DOJ's standard practices that occurred via Huntoon's invitation to the meeting is of no moment to Jeffries's claim over this nonselection.

Jeffries's assertion that O'Donnell, one of the panelists, arrived late to the interview and cut off his answers fares no

35

better. No reasonable factfinder could conclude, on the basis of O'Donnell's conduct, that DOJ's proffered reason for this nonselection was incredible or pretextual.[10] "Even if a plaintiff 'was victimized by poor selection procedures,' we may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (quoting *Fischbach*, 86 F.3d at 1183).

*Seventh Nonselection (Senior Policy Advisor for Health and Criminal Justice)*

Attempting to demonstrate that DOJ's qualifications-based explanation for Binkley's selection was pretextual, Jeffries seems to argue that, in explaining its decision to select Binkley, DOJ misstated both her qualifications and Jeffries's. He also contends that he was more qualified for the position than was Binkley.[11]

Jeffries's first argument relies entirely on statements in his own unsworn declaration. Jeffries asserts in his declaration

---

[10] Jeffries's statement in his opening brief (made without comment or citation) that at the time of the interview he "had two pending EEO cases . . . naming O'Donnell as a responsible management official," Appellant's Br. 49, lends no support to his argument, as the statement is both "mention[ed] . . . in the most skeletal way," *see Consol. Edison Co. of N.Y., Inc.*, 510 F.3d at 340, and unsupported by the record.

[11] Relying entirely on assertions in his own unsworn declaration as to what Binkley told him, Jeffries also asserts that DOJ departed from its normal procedures or practices by "secretly reassign[ing]" Binkley to the SAMH division at some unspecified point in the past. Appellant's Br. 55, 56 (citing J.A. 879). But Jeffries cannot rely on this inadmissible hearsay to create a genuine issue of fact, as it would not be converted into admissible evidence even were Jeffries to testify to the conversation. *See Gleklen*, 199 F.3d at 1369.

36

that, while Qazilbash stated in her memorandum
recommending Binkley for the position that Binkley "ha[d]
performed to a very high level in her work as a policy advisor
within the [SAMH] portfolio," J.A. 214, Qazilbash had told
Jeffries at some unspecified point in time that she had spent
more one-on-one time with Binkley than with Jeffries due to
Binkley's "inexperience with the [SAMH] subject matter," *id.*
880. Jeffries also himself critiques Binkley's performance in
her then-current role, stating that: Qazilbash had once replaced
one of Binkley's assignments with another because Binkley
struggled with the first; Binkley had "cried at work repeatedly"
and had said, two years prior to her interview and selection,
that the Senior Policy Advisor position was "too demanding"
and "outside of her Adjudications experience"; and Binkley
had funded some grants in a way that was "contrary to a major
audit recommendation." *Id.*

But even assuming *arguendo* the admissibility of the
declaration and all the statements contained therein, we fail to
perceive how these incidents, if true, belie Qazilbash's 2014
assessment of Binkley's *overall* performance. Qazilbash's
assessment was holistic, praising Binkley for "meeting
significant challenges in managing difficult projects,
developing communication materials at an advanced policy
level[,] and . . . prov[ing] her skills to develop new ideas and
programming." *Id.* 214. This evaluation is not felled by
Jeffries's recitation of particular incidents that, in *his* mind,
should have led Qazilbash to a different conclusion. We have
repeatedly declined "to serve as a 'super-personnel department
that reexamines an entity's business decisions,'" *Holcomb*, 433
F.3d at 897 (quoting *Barbour v. Browner*, 181 F.3d 1342, 1346
(D.C. Cir. 1999)), and we do so again here.

Citing his three-month service as Acting Senior Policy
Advisor four years prior to his nonselection, Jeffries also

37

appears to contend that O'Donnell misstated his qualifications. In support, he points to her statement that the major difference between Jeffries and Binkley "is that while [Jeffries] demonstrated good qualifications for his current position[,] . . . he did not demonstrate the more advanced qualifications needed for a GS-14 Senior Policy Advisor." Appellant's Br. 54 (quoting J.A. 874). However, Jeffries takes this statement, which was a critique of his failure in the interview to "demonstrate" his fitness for the Senior Policy Advisor position, out of its original context. Immediately following the sentence Jeffries quotes, O'Donnell went on to say:

> [Jeffries's] responses during the interview process focused more on process than substance. [He] had trouble articulating a vision and discussing specifics about new and innovative approaches. . . . In terms of qualifications, [Jeffries] focused on interaction with other BJA staff, his experience as a mentor for state policy advisors and BJA and his willingness to participate in a number of BJA projects and initiatives. . . . [T]hose behaviors . . . did not speak to his vision or skills as a Senior Policy Advisor.

J.A. 874. This evaluation of Jeffries's interview performance is not rendered a misstatement by Jeffries's *post hoc* assertion to this Court that he did in fact have the needed qualifications. Notably, Jeffries does not offer to the Court an alternative version of his interview – one in which he *contemporaneously* made his fitness for the position clear – and it is not our role to serve as Monday-morning quarterbacks rehashing DOJ's employment decisions. *See Holcomb*, 433 F.3d at 897.

38

Finally, Jeffries points to his service as Acting Senior Policy Advisor as evidence of his superior qualifications, stating that it "demonstrat[ed] that he could perform in the position, while Binkley had not" served in such a capacity. Appellant's Br. 54; *see* J.A. 439.  But Jeffries does not discuss his own qualifications any further, and this alone is not evidence by which "a reasonable employer would have found [Jeffries] *significantly* better qualified for the job."  *Holcomb*, 433 F.3d at 897.

## V.

Finding the District Court to have abused its discretion in denying Jeffries's Rule 56(d) motion with respect to the first nonselection, we reverse that denial, vacate the District Court's entry of judgment for DOJ on Jeffries's claims over the first nonselection, and remand the matter to the District Court for further proceedings consistent with this opinion.  In all other respects, the judgment of the District Court is affirmed.

*So ordered.*

PILLARD, J., *concurring in part and dissenting in part*:  I concur in the decision to reverse the judgment against Jeffries on his claim of discriminatory and retaliatory denial of the first of the series of seven promotions he sought.  We are unanimous in concluding that Jeffries was entitled to discovery before the district court could determine that neither race nor retaliation infected that promotion denial.  My colleagues nonetheless hold that no such motive can have tainted the ensuing non-promotions, so Jeffries has no right to discovery to test his employer's proffered nondiscriminatory reasons.  I disagree.  Consistent with our conclusion that the district court abused its discretion in dismissing Jeffries's first claim, we should have sent the entire case back to the district court for appropriate discovery before any decision on summary judgment.

Jeffries is an African American man with a master's degree in social work and prior experience as a Special Assistant at the White House Office of National Drug Control Policy.   He had been employed by the United States Department of Justice's Office of Justice Programs (OJP) for more than a decade, including a stint as an Acting Branch Chief, when he sought to advance from his position as a Policy Analyst at the GS-13 level in OJP's Bureau of Justice Assistance (BJA) by seeking the various promotions at issue here.  The federal Bureau of Justice Assistance works with local police departments and court systems across the United States to improve how they operate in the prevention of crime, violence, and drug abuse.   Jeffries was responsible for supervising a range of substance abuse programs, including 2,500 of the country's drug treatment courts—and his receipt of positive performance appraisals and awards suggests he excelled at that work.  Jeffries alleges that, when he sought the promotions at issue here, "the leadership of BJA and the Policy Office consisted almost entirely of Caucasians.  In the Policy Office, all but one of the GS-14 positions were occupied by Caucasians, and all 12 GS-15 and [Senior Executive Service] positions were occupied by Caucasians."  Compl. ¶ 9.  "Prior

2

to Jeffries' original EEO complaint there had been no African-
American males promoted or hired into management positions
at BJA for more than eight years, and no African-American
male supervisors hired in BJA in about 17 years." *Id.* ¶ 10.

As we unanimously hold, Jeffries is plainly entitled to
discovery to probe whether illicit motive figured into the first
disputed promotion denial. My colleagues so conclude
because Jeffries identified a procedural irregularity in the
application of his priority-consideration right that raises a
specific red flag. Maj. Op. at 20-23. Details about an
employer's violation of its own internal process are helpful to
explain the need for discovery, but not required—and for good
reason. It was mere happenstance that the successful selectee
for the first promotion confided to Jeffries the irregular timing
of her interview. *See* Compl. ¶ 16. Rule 56(d) does not
presume such leaks. All it requires is an explanation why the
nonmovant needs discovery to respond to summary judgment:
"If a nonmovant shows by affidavit or declaration that, for
specified reasons, it cannot present facts essential to justify its
opposition," the district court should allow discovery before
ruling on summary judgment. Fed. R. Civ. P. 56(d).

I agree with my colleagues that the district court erred in
rejecting Jeffries's Rule 56(d) submission. The information he
sought regarding his first promotion denial was not "irrelevant"
on the ground that "plaintiff's objective shortcomings for the
position at issue" were "undisputed." *Jeffries v. Lynch*, 217 F.
Supp. 3d 214, 232 nn.12, 13 (D.D.C. 2016). The interviewing
officials' unilateral and untested conclusions as to Jeffries's
ostensible "shortcomings," *id.* at 232 n.12, are far from
settled—they lie at the heart of his challenge. And Jeffries has
a right to explore known irregularities with the priority-
consideration process because they could be probative of
BJA's allegedly discriminatory and retaliatory motive. Maj.

3

Op. at 20-22; *see also* Jeffries's Rule 56(d) Mot. 4 (J.A. 888).
We thus correctly hold on this record that it was an abuse of
discretion to deny Jeffries discovery on the first promotion
denial.

But once we recognized Jeffries's right to discovery, we
should have remanded the whole case. I see no basis to draw
the line where the majority does. If on remand Jeffries
discovers that BJA had a discriminatory or retaliatory motive
for preventing his advancement into one job opening, that
might have some bearing on later denials of promotions in the
same office. For example, regarding his second promotion
denial, Jeffries asked to depose one member of the selection
panel who had admitted to reconciling scores, scratching out
scores for Jeffries and lowering them, Jeffries's 56(d) Mot. 5,
and another panelist whom Jeffries had named as a responsible
management official in prior EEO claims, *id.* at 5-6. Jeffries
sought to investigate the reason the Department changed the
listing related to his fifth promotion denial from GS-14 to GS-
13/14, which he suspects was to enable the Department to hire
someone preselected for the position but ineligible at the GS-
14 level. Jeffries's 56(d) Mot. 8. And the court denied
discovery on the seventh promotion denial, even though
Jeffries's Rule 56(d) submission listed reasons to suspect that
job, too, was filled by someone preselected. *Id.* at 12-13. To
test those irregularities, he seeks to collect the very types of
evidence that we have previously held probative of pretext.
*See, e.g.*, *Stoe v. Barr*, No. 18-5315, 2020 WL 2781649, at *4,
6, 8 (D.C. Cir. May 29, 2020); *Wheeler v. Georgetown Univ.
Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016). I see no reason
to cut off Jeffries's discovery rights piecemeal on closely
similar claims in view of what strikes me as a more-than-
adequate Rule 56(d) filing.

4

An employer's filing of a pre-discovery motion for summary judgment does not raise the substantive threshold for access to discovery. Our precedent interpreting Rule 56(d) has been informed by the broader context of the civil rules, under which a plaintiff who has stated a legally viable claim has a right to take discovery into matters in the opposing party's control.[1] Outside of the Rule 56(d) context, parties need no court permission to take discovery. In the ordinary course, a plaintiff in civil litigation is entitled to discovery after filing a complaint alleging "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2). Discovery "is available in all types of cases at the behest of any party, individual or corporate, plaintiff or defendant." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

BJA did not attack the sufficiency of Jeffries's complaint, presumptively entitling him to discovery, but instead answered and moved for judgment on the pleadings or summary

---

[1] The majority emphasizes that the Federal Rules allow summary judgment and an accompanying Rule 56(d) motion at any time. Maj. Op. at 2. While self-evidently correct, it is also obvious that certain types of cases are more amenable than others to summary judgment without discovery. For instance, district courts routinely resolve reviews of administrative action where the record is already complete, *see, e.g.*, *People of State of Cal. v. EPA*, 689 F.2d 217, 218 (D.C. Cir. 1982), arbitration or contract disputes where disputes concern written terms, *see, e.g.*, *Wash. Mailers Union No. 29 v. Wash. Post Co.*, 233 F.3d 587, 589 (D.C. Cir. 2000), and questions of law based on stipulated facts, *see, e.g.*, *Am. Postal Workers Union, AFL-CIO v. USPS*, 830 F.2d 294, 299-300 (D.C. Cir. 1987), without the need for discovery backed by compulsory process. As discussed *infra*, the requisite proof in Title VII cases, in contrast, is virtually always in the opposing party's control.

5

judgment—before discovery commenced. Viewing the record through the lens of summary judgment, the court held Jeffries's Rule 56(d) submission failed to preserve his discovery right. The district court stressed that BJA had produced documents and declarations to the Equal Employment Opportunity Commission, but Jeffries has not had a chance to test his employer's account, and we have repeatedly "rejected the notion that a district court can ordinarily resolve a Title VII complaint based on the administrative record." *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1045 (D.C. Cir. 2008) (citing *Hackley v. Roudebush*, 520 F.2d 108, 149, 151 (D.C. Cir. 1975)).

The logic of the right to discovery to substantiate an adequately pleaded claim is especially strong as applied to claims of intentional workplace discrimination or retaliation, which are virtually always fact-intensive and discovery-dependent. Disputes about intent, of course, "frequently turn on credibility assessments." *Crawford-El v. Britton*, 523 U.S. 574, 599 (1998). A plaintiff bearing the burden to establish the state of mind of the defendant decision makers must be able to probe her employer's proffered rationales if she is to have any hope of overcoming *Brady*'s demand for "sufficient evidence . . . that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

The Supreme Court has unanimously rejected a "heightened pleading standard in employment discrimination cases," acknowledging that "[b]efore discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case." *Swierkiewicz v. Sorema*, 534 U.S 506, 512 (2002). Akos Swierkiewicz did not have to allege specific irregularities in the employer's process, nor even a *prima facie*

6

case as such, nor did he have to show that he had or would likely uncover evidence of bias in order to open the door to discovery. Acknowledging the employer's argument that such a minimal pleading standard "will burden the courts and encourage disgruntled employees to bring unsubstantiated suits," the Court nevertheless insisted that "[w]hatever the practical merits of that argument," the pleading standard remains the same. *Swierkiewicz*, 534 U.S. at 514-15. The Supreme Court expressly reaffirmed *Swierkiewicz* in *Twombly*. 550 U.S. at 569-70.

Remanding with an invitation for discovery on all the promotion-denial claims would not have compelled an unmanageable discovery burden for the defendants. District courts have "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El*, 523 U.S. at 598; *see id*. at 598-99 (citing Rule 26(b)(2)). They have many options for setting the "timing and sequence of discovery," *id.* at 599 (citing Rule 26(d)), and "may at first permit the plaintiff to take only a focused deposition of the defendant before allowing any additional discovery," *id.* It is the requirement to plausibly plead a legally cognizable claim together with a district court's discretion to manage discovery under Rule 26—not a heightened Rule 56(d) standard out of line with Rule 8(a)(2) as understood in *Swierkiewicz*—that provide appropriate protection from unduly burdensome discovery.

Contrary to the majority's characterization, Maj. Op. at 17, our approach to Rule 56(d) has not been lax, but appropriately attentive to context. Accounting for the catch-22 that a party cannot know in detail the nature of information to which he lacks access, we have refrained from reading a demand for heightened specificity into Rule 56(d), the text of which asks only for the "reasons" the nonmovant "cannot present facts

7

essential to justify its opposition" to summary judgment. *Convertino* calls for a plaintiff to "outline" the particular facts he intends to discover and "describe why those facts are necessary to the litigation." *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012). And, as we emphasized in *Convertino* itself, "summary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). The adequacy of a Rule 56(d) submission "will necessarily be a case-specific inquiry, dependent on the nature of the claims and the existing record." *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 532 (D.C. Cir. 2019). In the typical Rule 56(d) case discovery has already been taken, so the question is whether the nonmovant is entitled to further discovery to oppose a summary judgment motion. *See, e.g.*, *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 23 (D.C. Cir. 2014) (referring to "further" and "additional" discovery sought); *Convertino*, 684 F.3d at 97 (referring to a four-year process of discovery that "was both slow and litigious" before the Rule 56(d) filing).

In a case like this one, in which no discovery has yet occurred and virtually all the evidence essential to the nonmovant's proof lies in the hands of the opposing party, the nonmovant's burden to say why "it cannot present facts essential to justify its opposition" is not onerous. Fed. R. Civ. P. 56(d). Reasoning from *Swierkiewicz*, we have noted that holding a Title VII plaintiff to "a particular method of raising an 'inference of discrimination' is especially inappropriate" before discovery, and required only that a Rule 56(d) submission "point[] to the *types* of evidence that *might* raise an inference of discrimination." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488-89 (D.C. Cir. 2006) (emphases added) (citing *Swierkiewicz*, 534 U.S. at 511-12). The Title VII plaintiff in *Ikossi*, for example, did not spell out in detail reasons to doubt

8

her supervisors' motivations in taking disciplinary action against her, but we reasoned that "[t]his lack of precision does not make any less self-evident . . . the nature of the evidence [plaintiff] seeks." 516 F.3d at 1045. It was clear enough that, "[b]y providing an explanation for their actions" at deposition, the decision makers "may reveal their motives, which lie at the heart of Dr. Ikossi's discrimination claims." *Id.* at 1045-46. We thus held that the district court abused its discretion in denying the plaintiff leave to depose those witnesses and take "reasonable discovery in this trial *de novo*." *Id.* at 1047. Like the Rule 56(d) filings in *Ikossi* and *Chappell-Johnson*, Jeffries's request for an opportunity to probe BJA's asserted reasons for repeatedly denying him promotions for which he alleges he was qualified falls into the category of "cases [in which] the relevance and necessity of the requested discovery are so obvious given the claims that little more than identification of the information is required to head off a pre-discovery motion for summary judgment." *Haynes*, 924 F.3d at 532-33 (citing *Ikossi*, 516 F.3d at 1045-46).[2]

At the end of the day, the majority's approach constitutes an error in the scope of Rule 56(d) relief warranted on a particular set of facts. We do not change the Rule 56(d) standard—nor could we. In affirming the district court's decision as to several of Jeffries's promotion denials, my

---

[2] We denied discovery in *Haynes* itself because, faced with the employer's evidence that all the laid-off electricians—including Haynes—lacked the license newly required under D.C. law whereas all the retained electricians had obtained that license, Haynes failed to explain the relevance of the discovery he sought regarding non-electricians not even subject to the requirement. 924 F.3d at 531-33. Needless to say, nothing in Rule 56(d) requires discovery not reasonably calculated to lead to information relevant to a claim or defense, nor need discovery be allowed where information not reasonably subject to dispute bars the claim or defense.

9

colleagues emphasize the abuse-of-discretion standard, appropriately noting that "we do not find an abuse of discretion based on whether we, if standing in the District Court's shoes, would have granted the motion." Maj. Op. at 17. I take it, then, that if the district court on second look were to conclude that discovery regarding other promotion denials is also appropriate, nothing would foreclose the court from exercising discretion to permit it. The district court's familiarity with the claims puts it in a strong position efficiently to supervise party-controlled discovery. And, with limited time, resources, and discovery opportunities, it is in the plaintiff's interest to focus discovery on the denied promotion(s) for which his qualifications were strongest, and where BJA's decision seemed the most questionable.

Because I would have remanded the case as a whole to the district court for appropriate discovery, I concur only in the majority's decision on Rule 56(d) as to the first promotion denial and respectfully dissent from its holdings on the others.